## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CHARLES YANEZ,<br>                              Plaintiff, | Civil No.  13-2243 (JRT/JSM) |
| v. | **MEMORANDUM<br>OPINION AND ORDER ON<br>DEFENDANTS' MOTIONS FOR<br>SUMMARY JUDGMENT** |
| GRACO INC., MIDWAY INDUSTRIAL<br>SUPPLY CO. INC., J.P. FLEXIBLES,<br>INC., and EXITFLEX USA, INC., | |
|                              Defendants. | |

Duane A. Lillehaug, **MARING WILLIAMS LAW OFFICE, PC**, P.O. Office Box 2103, Fargo, ND  58108, for plaintiff.

Scott M. Rusert, **NILAN JOHNSON LEWIS P.A.**, 120 South Sixth Street, Suite 400, Minneapolis, MN  55402, for defendants Graco Inc. and Midway Industrial Supply Co., Inc.

Nicholas C. Grant and Paul F. Ebeltoft, **EBELTHOFT SICKLER LAWYERS PLLC**, 46 West Second Street, Dickinson, ND  58601, for defendants J.P. Flexibles, Inc. and ExitFlex USA, Inc.

Plaintiff Charles Yanez was injured while working as a paint sprayer at DMI Industries, Inc. ("DMI") in West Fargo, North Dakota.  He suffered injuries to his left hand when a whip hose that was part of a paint spray system failed while he was high-pressure spray painting the inside of a wind turbine tower.  The hose itself was manufactured by a Swiss corporation, ExitFlex S.A. ("ExitFlex SA"), which is not a party to this action.  Yanez instead brings this products liability action against various other entities that were involved in the distribution of the hose and paint system: J.P. Flexibles, Inc. ("JP Flexibles"), the now-dissolved United States distributor for ExitFlex

SA's products; ExitFlex USA, Inc. ("ExitFlex USA"), the current United States distributor for ExitFlex SA's products; GRACO, Inc. ("Graco"), a Minnesota corporation that purchased the hose to be used in a paint spray system; and Midway Industrial Supply Co. ("Midway"), which installed the paint spray system at DMI. All defendants move for summary judgment, arguing that they are not the manufacturers of the hose and cannot be held liable as nonmanufacturing sellers under North Dakota law. The Court concludes that a reasonable jury could find both that JP Flexibles falls within the definition of manufacturer under North Dakota law and that ExitFlex USA may be held liable as a successor to JP Flexibles, and will thus deny JP Flexibles' and ExitFlex USA's motions for summary judgment. With regard to Graco and Midway, however, the Court concludes that no reasonable jury could find that either can be held liable under North Dakota law and will grant their motion for summary judgment.

## BACKGROUND

The Court will recite the relevant background facts according to the various entities involved in the manufacture and distribution of the hose and paint system that Yanez claims caused his injury.

## I.      EXITFLEX SA

The hose in question, often referred to as a "Graco 246193" or a "WE24" hose (hereinafter "the hose"), was manufactured by ExitFlex SA. (Aff. of Joseph Medvecky in Supp. of J.P. Flexibles' Mot. for Summ. J. ("Medvecky Aff. Docket No. 155") ¶ 7, Jan. 15, 2014, Docket No. 155.) ExitFlex SA is a Swiss corporation engaged in the

business of manufacturing hoses, fittings, and other component parts.   (*Id.* ¶ 6.)

ExitFlex SA was 100% owned by a man named Marcel Leisi from 1985 through 2006

and Leisi was its sole shareholder.  (Aff. of Duane A. Lillehaug, Ex. C ("J.P. Flexibles &

ExitFlex USAs Resp. to Pl.'s Interrogs.") at 2, Feb. 5, 2014, Docket No. 166.)[1]  Leisi was

also the 100% owner and sole shareholder of a separate Swiss corporation called Exit

S.A. ("Exit SA") from 1985 through 2006.  (*Id.*)  Joseph Medvecky, the president of JP

Flexibles (Aff. of Joseph Medvecky in Supp. of ExitFlex USA's Mot. for Summ. J.

("Medvecky Aff. Docket No. 150") ¶ 1, Jan. 15, 2014, Docket No. 150), also stated in his

affidavit that "[a]t all times relevant to this case, Exit SA was the sole shareholder of

ExitFlex SA" (Medvecky Aff. Docket No. 155 ¶ 15).  Leisi's ownership of ExitFlex SA

ended in 2010.   (Aff. of Nicholas C. Grant, Ex. 1 (Dep. of Joseph M. Medvecky

("Medvecky Dep.")) 116:3-11, Jan. 15, 2014, Docket No. 156.)

## II.     JP FLEXIBLES AND EXITFLEX SA

JP Flexibles was the exclusive distributor of ExitFlex SA's products in the United

States beginning in 1985.  (Medvecky Dep. 6:12-18; 7:16-19.)  It sold ExitFlex SA's

products to distributors and original equipment manufacturers ("OEMs") in the paint

spray industry.  (*Id.* 9:10-19.)  JP Flexibles did not do business with any other products

besides those from ExitFlex SA.  (*Id.* 8:21-24.)  OEMs typically purchase a product from

a manufacturer like ExitFlex SA and incorporate it into a product of its own.  (*Id.* 9:17-

---

[1] Except for depositions and unless otherwise noted, the Court cites to the CMECF pagination.

23.)  Graco is an OEM that JP Flexibles sold to, which Medvecky called "the leader in [the paint spray industry]," explaining that "everybody knows them."  (*Id.* 15:11-20.) According to Medvecky, JP Flexibles "did not design, manufacture or apply end fittings or identification band to hoses of the type at issue in this case, but rather, was a mere reseller of hoses of the general type involved in this litigation which were designed, manufactured and fitted by others not under the direction or control of [JP Flexibles]." (Medvecky Aff. Docket No. 155 ¶ 4.)

### A.  Ownership of JP Flexibles

Medvecky explains that

> [w]hen it was incorporated in 1985, J.P. Flexibles, Inc. was owned in the following proportions: J.P. Fatzer – 80%; Exit SA – 20%.  After beginning my employment in 1998, J.P. Flexibles, Inc. was owned in the following proportions: J.P. Fatzer – 75%; Exit SA – 20%; and myself, Joseph Medvecky – 5%.  At some point in 2000, my ownership interest was increased to 10%, with J.P. Fatzer continuing to own 70%, and Exit SA owning 20%.  This ownership percentage did not change until July 21, 2006.  Following his death on April 13, 2005, the Estate of J.P. Fatzer, on July 21, 2006, sold all of his stock in J.P. Flexibles, Inc. to Exit SA.  The sale of J.P. Fatzer's stock by his Estate was memorialized by the . . . 'Stock Purchase Agreement.'

(*Id.* ¶¶ 8-13.)

Medvecky testified in his deposition, taken on August 9, 2012: "After J.P. Fatzer died, his 70 percent was purchased by ExitFlex SA.  So it was now 90 percent ExitFlex SA, 10 percent myself."  (Medvecky Dep. 118:7-10.)  Medvecky's 5% share increased to 10% sometime around the year 2000, and Fatzer's share accordingly decreased to 70%. (*Id.* 117:22-118:2.)  Fatzer died in April 2005, but the purchase of the shares took place

in 2006.  (*Id.* 118:11-18.)  When ExitFlex USA was formed in 2007, its shares were 90

percent owned by ExitFlex SA and 10 percent by Medvecky.  (*Id.* 118:19-119:8.)

### B.    Transition to ExitFlex USA

In his deposition, Medvecky explained that the transition from JP Flexibles to

ExitFlex USA occurred after JP Flexibles lost several employees in 2005, including

J.P. Fatzer, and that sometime in the next year, ExitFlex SA bought the shares of

J.P. Fatzer from his estate and became a 90% shareholder.  (Medvecky Dep. 12:1-18.)

With only two shareholders left

> then – there was a business decision with the two shareholders together,
> what we want to do, and we decided to form a new corporation.  I sought
> out a lawyer and we had a contract written up and we had an asset
> purchase.  We didn't assume any liabilities of J.P. Flexibles, and then [o]n
> April 1st, 2007, ExitFlex USA started business.

(*Id.* 12:20-13:3.)   ExitFlex USA, which had been incorporated in New Jersey on

February 27, 2007, (Medvecky Aff. Docket No. 150 ¶ 3; *see also id.*, Ex. B) purchased

all of J.P. Flexibles' assets on April 1, 2007, pursuant to an "Asset Purchase Agreement,"

under which ExitFlex USA did not assume any liabilities of JP Flexibles.  (*Id.* ¶¶ 4-5; *see*

*also id.*, Ex. C.)  The Asset Purchase Agreement included the following section:

> **No Assumption of Liabilities.** Except as set forth in Sections 1.1(e), 1.1(f),
> and 1.1(g), Buyer is acquiring the Assets hereunder without any assumption
> of Seller's debts, obligations, liabilities, accounts payable, or commitments
> . . . . Seller shall pay and discharge . . . . [a]ll obligations and liabilities of
> Seller whether arising before or after the Closing Date for contractual
> obligations in connection with products and services sold, distributed or
> provided by Seller, including liabilities for personal injury . . .  based on
> product liability claims . . . .

(*Id.*, Ex. C ¶ 1.3 (formatting omitted).)   JP Flexibles was dissolved as a corporation on January 7, 2008.  (*Id.* ¶ 2; *see also id.*, Ex. A.)  During the period of overlap when both entities existed, ExitFlex USA took over sales on April 1, 2007 and, according to Medvecky, "J.P. Flexibles continued collecting the bills, paying their – all their obligations, collecting all the receivables that were owed to them and then by December 31 [2007] they dissolved." (*Id.* 13:14-21.)   All of the employees from JP Flexibles became employees of ExitFlex USA as of April 1, 2007 (there were two at the time)[2], and ExitFlex USA performed the account-collecting services and other closing work for JP Flexibles.  (*Id.* 14:8-24.)

Medvecky testified that there was no "difference in the product line between J.P. Flexibles and ExitFlex USA," and that it was "always ExitFlex SA's products for both companies."  (*Id.* 14:25-15:7.)   He also testified that ExitFlex USA's business operation has been "substantially the same" as JP Flexibles; it is also the exclusive distributor of ExitFlex SA products in the United States.   (*Id.* 10:21-11:3.)   Like JP Flexibles, ExitFlex SA products are the only products ExitFlex USA distributes.  (*Id.* 11:18-21.)

When asked if Marcel Leisi was ever affiliated with ExitFlex USA in any capacity, Medvecky stated that "[ExitFlex SA] w[as] a stockholder in the company and he in turn owned that company.  So yes," and answered "[c]orrect" to the follow-up

---

[2] The other employee was named Lucien, and at the time of the deposition Medvecky, Lucien, and one other person named Wantoul Basil were the only employees of ExitFlex USA besides independent sales representatives.  (Medvecky Dep. at 128:13-129:4-15.)

question of whether "[Leisi] owned ExitFlex SA, which is still as we sit here today the majority stockholder of ExitFlex USA, correct?" (*Id.* 116:15-23.)

### C.   ExitFlex USA Now

A letter from Medvecky to counsel in this case states that after May 4, 2009, all hose production for ExitFlex USA stopped and that "Exit [SA] and ExitFlex [SA] still exist but the production is limited to spray tips and swivels. . . . Today, Marcel Leisi is retired.  He is in his mid-eighties and in very poor health.  The events of 2009 and 2010 were unavoidable and not of his choosing.  He was forced out of his own company.  I am hopeful that Marcel will not have to be involved with this case." (J.P. Flexibles & ExitFlex USA's Resp. to Pl.'s Interrogs. at 6.)  On May 4, 2009, eighty percent of Exit SA shares were transferred to Polyhose India Private Ltd., with another twenty percent remaining with Leisi.  (*Id.* at 7.)  On December 13, 2010, ExitFlex SA announced that Leisi had transferred complete ownership of the "ExitFlex Group" to Polyhose.  (*Id.* at 8.)

### D.   Clarification of JP Flexibles' and ExitFlex USA's Ownership

Although Medvecky stated at several points in his deposition that ExitFlex SA (the manufacturer) had an ownership interest in JP Flexibles and ExitFlex USA, he later filed an affidavit seeking to correct that testimony and instead affied that Exit SA in fact held the ownership interest he had previously attributed to ExitFlex SA.  He first did so in an affidavit submitted with a surreply to Yanez's reply brief on his motion to change venue. (Aff. of Joseph Medvecky re: Surreply ¶ 7, Feb. 20, 2013, Docket No. 116 ("During my

deposition taken on August 9, 2012 I unintentionally confused the two Swiss corporations while discussing ownership of J.P. Flexibles, Inc. and did not notice my mistake until asked to prepare an affidavit for this Sur-Reply.").)  He also did so in a later affidavit in support of JP Flexibles' motion for summary judgment before the Court, in which he states: "At all times relevant to this case, Exit SA was the sole shareholder of ExitFlex SA.  At no time has ExitFlex SA, the entity that manufactures the Graco hose, owned any part of J.P. Flexibles, Inc." and that "[a]ny prior confusion as to the name of the Swiss corporation owning shares in J.P. Flexibles, Inc. was inadvertent on my part and corrected by me, through counsel, as soon as the mistake in prior testimony was realized."  (Medvecky Aff. Docket No. 155 ¶¶ 15-17.)

### III.   THE HOSE

The hose in this case, ExitFlex SA part number WE24, was a quarter-inch hose rated up to 8,000 psi.  (Medvecky Dep. 18:17-22.)  Graco purchased the hose because it had developed paint spray system pumps that went up to 8,000 psi and needed hoses that could handle that same level of pressure.  (*Id.* 21:3-11.)  Graco purchased the hose to use in such a high pressure paint spray system, which it sold to Midway and Midway installed at DMI.  Angela Redlund-Spieker, a product safety and compliance engineer with Graco (Second Aff. of Scott M. Rusert, Ex. M (Dep. of Angela Redlund-Spieker ("Redlund-Spieker Dep.")) at 10:20-25, Feb. 26, 2014, Docket No. 177), explained that Graco makes fluid-handling equipment, which includes pumps and paint sprayers (Redlund-Spieker Dep. 12:15-22.)  She explained that Graco sells its products through its

distributor channels, selling to distributors and then the distributors go to the end users and sell the products to them directly, but it does not sell directly to end users. (*Id.* 14:16-25.)  Redlund-Spieker explained that Graco would sell the whole package of a spray system to a distributor such as Midway. (*Id.* 17:22-18:8.)  The paint system in question was a new product line released by Graco around 2002 or 2003. (*Id.* 18:18-19:6.)  Before this system, Graco had not purchased high-pressure hoses through JP Flexibles before, but had purchased them from other companies – including hoses with ratings from 5,000 to 10,000 psi. (*Id.* 20:3-16.)  She explained her understanding of the process used to select the whip hoses for the high-pressure systems:

> [T]he typical process for something like that would be is GRACO, we understand what our pressure rating is of our equipment, and we understand what type of diameter we want for that, and we know the type of material that we are – common material to be pumped through this hose.  So that gets us to our understanding of a pressure for a hose, a material compatibility for the hose and a diameter for it.  And once we know that, we work with our purchasing department and they start looking at all of our hose suppliers to try to see if there is a hose that already exists out there that would work for our application.  And if they identify a hose that one of our hose suppliers says is a good option for us, we usually get our hose suppliers any certifications or approvals that they have on their hose prior to that.  Once we get it into GRACO, we do some verification or audit testing, usually involves a burst test and then we test it out.  And if it meets all of our needs, then we would go ahead and use that hose.

(*Id.* 24:11-25:9.)  She explained that the hose from JP Flexibles would have needed to meet their pressure requirements and burst pressure requirements: that it has "gone through some type of impulse testing that our suppliers put it through" and that it works physically. (*Id.* 26:13-27:2.)  She explained that Graco expects the supplier to do the impulse testing, but that Graco also has the capacity to do impulse testing at its own

facilities, although its "preference is to always get that from our supplier." (*Id.* 30:19-24.)  Her staff did not recall Graco actually completing any testing for this hose, but rather recalled only looking at a summary sheet of testing done. (*Id.* 34:24-35:13.)  She explained that this testing is done "to get some baseline ideas and verify that that concept will work for us." (*Id.* 35:19-36:3.)  She also discussed a product qualification test that was done on the hose in August 2002, which tested to see if the hose could handle the pressure that Graco intended to use in its design, and stated that the hose had a rating of 8,000 psi, which was higher than their systems requirement of 7,250 psi. (*Id.* 38:6-39:13.)  She also reviewed records of ExitFlex SA certificates as to pressure ratings of the hose. (*Id.* 44:1-16.)

At some point after Medvecky sent Graco a sample of the hose in July 2001 (Aff. of Scott M. Rusert, Ex. B, Jan. 27, 2014, Docket No. 159), Graco requested that JP Flexibles imprint several pieces of information onto the metal ferrule at the end of the hose  (Medvecky Dep. 41:17-23.)  Medvecky asked ExitFlex SA about it and, according to Medvecky, "they came up with this . . . I.D. ring which you could put whatever information permanently on the hose to identify it after it's been used." (*Id.* 41:24-42:6.)  Medvecky sent Graco a sample of a hose with the identification ring ("ID ring") as "our alternative to printing the information on the ferrule itself, which has a very limited print area," and suggested that the ID ring "be supplied on one end only, due to the fact that the hose is a relatively short length." (Rusert Aff., Ex. D.)  Graco also asked Medvecky if its own warning label could replace the ExitFlex SA warning label on the hose, which ExitFlex SA agreed to do. (*Id.*, Ex. F; Medvecky Dep. 45:18-46:6.)

Graco's first purchase order for the WE24 hose was May 31, 2002, and January 23, 2006 was the last date Graco purchased the WE24 hose from JP Flexibles. (Medvecky Dep. 51:4-52:2, 64:10-15.)   The last shipment of WE24 hoses from JP Flexibles to Graco was in March 2006.  (*Id.* 80:6-81:2.)

## IV.   PROCEDURAL HISTORY

After his injury on November 10, 2006, Yanez filed this action on November 1, 2010, in Cass County court in Fargo, North Dakota; Graco and Midway removed to the United States District Court for the District of North Dakota.  (Notice of Removal, Dec. 2, 2010, Docket No. 1; *id.*, Ex. A.)   Once in federal court, Yanez amended his complaint.  (Am. Compl., July 6, 2011, Docket No. 27.)   ExitFlex USA and JP Flexibles then simultaneously moved to dismiss for lack of personal jurisdiction and moved for summary judgment.  (Mot. to Dismiss, Dec. 11, 2012, Docket No. 86; Mot. for Summ. J., Dec. 11, 2012, Docket No. 90.)   Yanez filed a motion to transfer venue to the District Court in Minnesota in the alternative to dismissing for lack of personal jurisdiction. (Mot. to Change Venue in the Alternative, Jan. 10, 2013, Docket No. 99.)   After the parties briefed all of the motions, Judge Ralph R. Erickson held a hearing on the jurisdiction, change of venue, and summary judgment motions on August 1, 2013. (Minute Entry, Aug. 1, 2013, Docket No. 131.)   On August 16, 2013, Judge Erickson issued an order concluding that the District of North Dakota lacked personal jurisdiction over JP Flexibles and, instead of dismissing for lack of jurisdiction, transferred venue to the District of Minnesota; the order declined to reach the summary judgment issues.

(Order, Aug. 16, 2013, Docket No. 132.)  The case was then transferred to this District on August 16, 2013, and beginning on January 15, 2014, the defendants re-filed motions for summary judgment.  (*See* Docket Nos. 133, 148, 153, 157.)  These summary judgment motions are now before the Court.

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## II.    PRODUCTS LIABILITY UNDER NORTH DAKOTA LAW

The parties agree that North Dakota law governs this action.[3]   North Dakota has enacted a statute which has replaced the common law on certain issues in the realm of products liability under North Dakota law.  *See Bornsen v. Pragotrade, LLC*, 804 N.W.2d 55, 60 (N.D. 2011) ("The Legislature has informed us that the North Dakota Century Code establishes the law of this state respecting the subjects to which it relates," such that "there is no common law in any case in which the law is declared by the code" (alterations and internal quotations omitted)).   In enacting the statute, the legislature explained that "it has become increasingly evident that there are still serious problems with the current civil justice system," and that "[a]s a result, there is an urgent need for additional legislation to establish clear and predictable rules with respect to certain matters relating to products liability actions."  N.D. Cent. Code § 28-01.3-07, subd. 2.

---

[3] Because this case was transferred to this district from the District of North Dakota for lack of personal jurisdiction, it is the Court's opinion that the law of this forum should apply, rather than the law of the forum in which jurisdiction was not proper.  *See Eggleton v. Plasser & Theurer Exp. Von Bahnbaumaschinen Gesellschaft, MBH*, 495 F.3d 582, 588 (8th Cir. 2007) (joining other circuits in concluding that law of transferee forum should apply when the transferor court lacks personal jurisdiction, reasoning that to apply the law of the transferor forum would be unfair to defendants because they would "be made to suffer the choice-of-law consequences of a plaintiff's mistake in choosing such a forum to file his lawsuit").  However, all defendants – including JP Flexibles, for which there is not personal jurisdiction in North Dakota – have based the entirety of their arguments and briefing upon North Dakota law.  Upon a direct question from the Court during oral argument, counsel for JP Flexibles stated that it believes the law of North Dakota should apply.  Thus, given that the purpose of the rule espoused in *Eggleton* is to protect defendants over whom the transferor forum does not have jurisdiction and that defendant here – JP Flexibles – has affirmatively consented to the application of North Dakota law, the Court will not disturb the parties' unanimous preference for North Dakota law.

One of the matters addressed by the statute is the liability of nonmanufacturing sellers, which the statute delineates as follows:

1. In any products liability action maintained against a seller of a product who did not manufacture the product, the seller shall upon answering or otherwise pleading file an affidavit certifying the correct identity of the manufacturer of the product allegedly causing the personal injury, death, or damage to property.

2. After the plaintiff has filed a complaint against the manufacturer and the manufacturer has or is required to have answered or otherwise pleaded, the court shall order the dismissal of the claim against the certifying seller, unless the plaintiff can show any of the following:

   a. That the certifying seller exercised some significant control over the design or manufacture of the product, or provided instructions or warnings to the manufacturer relative to the alleged defect in the product which caused the personal injury, death, or damage to property.

   b. That the certifying seller had actual knowledge of the defect in the product which caused the personal injury, death, or damage to property.

   c. That the certifying seller created the defect in the product which caused the personal injury, death, or damage to property.

3. The plaintiff may at any time prior to the beginning of the trial move to vacate the order of dismissal and reinstate the certifying seller if the plaintiff can show any of the following:

   a. That the applicable statute of limitation bars a product liability action against the manufacturer of the product allegedly causing the injury, death, or damage.

   b. That the identity of the manufacturer given to the plaintiff by the certifying defendant was incorrect.

N.D. Cent. Code § 28-01.3-04. The statute defines a "manufacturer" as

a person or entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a component part of a product prior to the sale of the product to a user or consumer. The term includes any seller of a product who is owned in whole or significant part by the manufacturer or who owns, in whole or significant part, the manufacturer.

*Id.* § 28-01.3-01, subd. 1.  In answering a certified question as to whether the common law "apparent manufacturer" doctrine applied in North Dakota, the North Dakota Supreme Court has held that this statutory scheme evidenced a clear intent by the legislature to replace the common law such that it left "no room for us to recognize – or . . . 'adopt' – the common law or the Restatement theory of 'apparent manufacturer' liability." *Bornsen*, 804 N.W.2d at 61.  The court observed that

> [t]he specificity included in the Legislature's adoption of N.D.C.C. ch. 28–01.3 indicates to us the clear message that it intended to restrict, rather than expand, the availability of product liability actions as a remedy for personal injury, death or property damage arising out of use of defective products. One means utilized by the Legislature to carry out its intent was to define who is a "manufacturer," to define who is a "seller" and then to sharply curtail liability of a "nonmanufacturing seller."

*Id.*  The North Dakota Supreme Court has elsewhere instructed that "[t]he primary objective in interpreting a statute is to determine the intent of the legislature by first looking at the language of the statute" and giving the words in the statute "their plain, ordinary, and commonly understood meaning."  *Sorenson v. Felton*, 793 N.W.2d 799, 801 (N.D. 2011) (internal quotations omitted).

## III.   JP FLEXIBLES' MOTION FOR SUMMARY JUDGMENT

JP Flexibles moves for summary judgment, arguing that it cannot be held liable for Yanez's injury because it did not manufacture the hose and cannot be held liable as a nonmanufacturing seller under North Dakota statute.  Yanez makes several arguments in opposition to JP Flexibles' motion: that JP Flexibles is not entitled to dismissal under the nonmanufacturing seller section of the statute, that the facts of JP Flexibles' ownership

are disputed because of Medvecky's inconsistent deposition testimony and affidavit or that JP Flexibles should be estopped from denying ownership by ExitFlex SA, and that JP Flexibles is a manufacturer under the North Dakota statute's definition because it is owned in significant part by the manufacturer.

The Court concludes that a reasonable jury could find that JP Flexibles falls within the definition of manufacturer under the statute because, when it sold WE24 hoses to Graco, it was owned in "significant part" by Exit SA.  *See* N.D. Cent. Code § 28-01.3-01, subd. 1.  The Court bases this conclusion on determinations that (1) undisputed facts indicate that ExitFlex SA (the actual manufacturer) was wholly owned and indistinguishable from Exit SA (which had an ownership interest in JP Flexibles), such that Exit SA's ownership interest in JP Flexibles is fairly treated as ownership by the manufacturer for the purposes of the statute, and (2) a reasonable jury could find that Exit SA's ownership of JP Flexibles at the relevant time period was "significant."[4]

### A.     Treating Exit SA as the Manufacturer

Although he stated in his deposition that ExitFlex SA held an ownership interest in JP Flexibles before its dissolution, Medvecky's corrective affidavit and accompanying

---

[4] The Court declines to base its denial of JP Flexibles' motion for summary judgment on Yanez's interpretation of the nonmanufacturing seller section of the statute.  As explained below with regard to Graco and Midway, it is not clear how that section should apply here, given that JP Flexibles did not certify the identity of the manufacturer in an affidavit and that Yanez has not filed a complaint against ExitFlex SA.  Instead, the Court bases its denial of JP Flexibles' motion for summary judgment on a determination that a reasonable jury could conclude that it is a manufacturer under the statute.

stock certificates demonstrate that the relevant interest was actually held by Exit SA.

Yanez argues that this confusion creates a dispute of fact – both because there is a

contradiction between the deposition testimony and the affidavit and because that

contradiction calls into question Medvecky's credibility on the issue.   Even if this does

amount to a fact dispute,[5] the Court declines to deny JP Flexibles' motion on this ground.

Rather, the Court concludes that Exit SA can be treated as the manufacturer for the

purposes of the North Dakota statute, so it does not matter whether JP Flexibles was

owned in part by ExitFlex SA or Exit SA.

The North Dakota Century Code includes in its definition of manufacturer "any

seller of a product who is owned in whole or significant part by the manufacturer."  N.D.

Cent. Code § 28-01.3-01, subd. 1.  This section would preclude a seller from escaping

liability where it is controlled by or essentially the same entity as the manufacturer.  This

---

[5] The cases Yanez cites for this proposition do not clearly establish that Medvecky's conflicting deposition testimony and affidavit give rise to a fact dispute precluding summary judgment.   Yanez cites cases in which a **plaintiff's** contradicting affidavit and deposition testimony did **not**, under the circumstances, create an issue of material fact precluding summary judgment for the defendant, *see, e.g., City of St. Joseph, Mo. v. Sw. Bell Tel.*, 439 F.3d 468, 475-76 (8th Cir. 2006); *Garnac Grain Co. v. Blackley*, 932 F.2d 1563, 1568 (8th Cir. 1991), and a case in which the plaintiff's testimony at trial contradicted earlier deposition testimony and the Eighth Circuit concluded that, because there was an explanation for the discrepancy and it did not appear to be a "ruse designed to raise an issue of fact," the district court did not err in denying the defendant's motion for judgment notwithstanding the verdict after trial on the grounds that the deposition testimony established that defendants should win as a matter of law, *Kim v. Ingersoll Rand Co.*, 921 F.2d 197, 198-99 (8th Cir. 1990).  None of these cases directly support what Yanez seeks here: the first two involve a plaintiff seeking denial of summary judgment on account of potentially self-generated disputes of facts and the latter involves a post-trial motion, not whether summary judgment should be granted.  Furthermore, none of the cases involved a corrective affidavit with documentary proof that the prior deposition testimony had been mistaken, as Medvecky provided here in the form of stock certificates.  Thus, the Court declines to deny JP Flexibles' motion for summary judgment on this ground.

suggests that the legislature intended to prevent entities from escaping liability by creating artificial divides in an operation through distinct corporate forms. Here, where the record indicates that ExitFlex SA and Exit SA are, in essence, the same entity, this legislative intent as evidenced by the text of the statute suggests that the Court should treat them as such for the purposes of determining liability under the statute.

Although ExitFlex SA and Exit SA appear to technically be separate entities, all evidence in the record indicates that they were essentially indistinguishable. First, Medvecky, the president of the company that sold exclusively products manufactured by ExitFlex SA (and therefore reasonably expected to be familiar with the circumstances), confused the two in his deposition and repeatedly stated that ExitFlex SA had an ownership interest in JP Flexibles when it was actually Exit SA. Second, Exit SA appears to have been the sole shareholder of ExitFlex SA (Medvecky Aff. Docket No. 155 ¶¶ 5, 15), although Medvecky also represented in the interrogatories that the same person – Marcel Leisi, owned 100% of the shares in Exit SA and ExitFlex SA, and was the Managing Director and the sole member of the Board of Directors of both entities (J.P. Flexibles & ExitFlex USA's Resp. to Pl.'s Interrogs. at 2). Thus, either Exit SA wholly owned ExitFlex SA, or both were wholly owned by the same individual, and this, second, instance of Medvecky's inability to distinguish the corporate forms of the Swiss companies further evidences the lack of any significant difference between ExitFlex SA and Exit SA.

Under such circumstances the Court concludes that the North Dakota legislature would have intended Exit SA to fall within the definition of manufacturer because it is

entirely indistinguishable from the manufacturer, ExitFlex SA.  In addition to the strong

indication from the text of the statute that otherwise indistinguishable entities should not

escape liability because they have artificially differentiated their roles, the North Dakota

Supreme Court has indicated in other contexts that sole ownership or control of one entity

by another entity permits the entities to be treated the same.  *Cf. Littlefield v. Union State

Bank, Hazen, N.D.*, 500 N.W.2d 881, 885 (N.D. 1993) ("In the context of res judicata, the

plaintiffs' sole ownership of the corporation and complete control of its affairs

constituted a sufficient common interest to place them in privity with the corporation.");

*see also Emp'rs Reinsurance Corp. v. Landmark*, 547 N.W.2d 527, 536 (N.D. 1996)

(observing that "[w]hen one person owns a controlling interest in the corporation and

dominates the corporation's actions, his acts are the corporation's acts" and holding that

an insurance company was owned a duty of indemnity and defense from its reinsurer,

despite one of its two owners' concealment of the claim for several years, because the

employee/owner's "control over and ownership of [the insurance company] was not so

substantial as to require imputation" (internal quotation marks omitted)).  The Court

therefore concludes that Exit SA may be treated as the manufacturer for the purposes of

products liability under the statute because it is, in essence, the same entity as ExitFlex

SA.

If Exit SA is a manufacturer under the statute, then its ownership of JP Flexibles is

relevant for the purposes of determining whether JP Flexibles falls within the definition

of manufacturer under the statute: if Exit SA's ownership of JP Flexibles was in

"significant part," then JP Flexibles, too, falls within the definition of manufacturer under

the statute.  This conclusion – that Exit SA can be treated as the manufacturer and its ownership of JP Flexibles, if significant, can extend the reach of the definition to include JP Flexibles – is consistent with the legislative intent of North Dakota's products liability statute.  Although the North Dakota Supreme Court observed in *Bornsen* that the legislature "intended to restrict, rather than expand, the availability of product liability actions," the court explained further that it did so by setting out a definition of manufacturer.  804 N.W.2d at 61.  The statute's definition of manufacturer clearly indicates that the legislature intended that sellers not escape liability when they are too closely wound up with the manufacturing entity – either by owning it or being owned by it.  To not treat Exit SA as the manufacturer here, including for the purposes of determining whether JP Flexibles can be liable as a manufacturer, would permit a manufacturer to set up a shell company to create one degree of separation between it and a seller such that the seller would be insulated from liability despite its ties to the manufacturer.  The Court concludes that treating Exit SA as the manufacturer for the purposes of determining whether JP Flexibles is owned in significant part by the manufacturer is consistent with the intent of the statute and will treat Exit SA as the manufacturer for the purposes of determining liability.[6]

---

[6] To the extent that in reaching this conclusion the Court is addressing "a novel or unresolved issue of state law," the Court concludes that this is its best prediction of "how the state supreme court would resolve the issue." *Burks v. Abbott Labs.*, 917 F. Supp. 2d 902, 914 (D. Minn. 2013).

### B.      Whether Exit SA's Ownership Was Significant

The Court must next consider whether a reasonable jury could conclude that JP Flexibles was owned in "significant part" by Exit SA such that JP Flexibles can be considered a manufacturer under the statute.   N.D. Cent. Code § 28-01.3-01, subd. 1. The parties agree and the Court's research confirms that the North Dakota Supreme Court has not elaborated on the meaning of "significant" in the context of this statute.   Thus, the Court will attempt to "predict how the [North Dakota] supreme court would resolve the issue," *Burks v. Abbott Labs.*, 917 F. Supp. 2d 902, 914 (D. Minn. 2013), "using decisions from other jurisdictions as aids," *see Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.*, 387 F.3d 705, 715 (8th Cir. 2004).

The North Dakota Supreme Court has instructed that courts should seek to give "meaning and effect to every word, phrase, and sentence" in a statute.   *State ex rel. Dep't of Human Servs., Child Support Enforcement Div. v. N.D. Ins. Reserve Fund*, 822 N.W.2d 38, 41 (N.D. 2012).   In order to determine what amount of ownership triggers manufacturer liability under the statute, the Court begins by examining the rationale for including in the definition of manufacturer those entities owned by or owning the manufacturer.   Typically, courts look to ownership for determining liability because ownership can be a measure of the degree of control and that control can serve as a justification for liability.   *See, e.g.*, *Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 180-81 (5th Cir. 1981) ("Ownership of a controlling interest in a corporation entitles the controlling stockholder to exercise the normal incidents of stock ownership, such as the right to choose directors and set general policies, without forfeiting the protection of

limited liability," but "[t]o justify the extraordinary step of holding the dominant party liable, the jury must find that this control amounts to total domination of the subservient corporation" (internal quotations omitted); *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 840-41 (D. Del. 1978) ("Whether an agency relationship exists between a parent corporation and its subsidiary is normally a question of fact.  The central factual issue is control," and stock ownership is one of many factors courts should look to for determining amount of control (footnote and internal citation omitted)).

Courts in other jurisdictions have concluded that the actual percent ownership of a corporation is not dispositive, but rather part of a more comprehensive inquiry into the degree of control that an owner exerts over the corporation or other shareholders.  *See, e.g.*, *Hollis v. Hill*, 232 F.3d 460, 466 n.16 (5th Cir. 2000) ("[O]ther jurisdictions have agreed that the question of minority versus majority should not focus on mechanical mathematical calculations, but instead, [t]he question is whether they have the power to work their will on others." (internal quotations omitted)); *Sharkey v. Emery* (*In re Sharkey*), 272 B.R. 574, 583 (Bankr. D.N.J. 2001) ("[T]he extent of a plaintiff's interest in a corporation, even if it is over 50% ownership of the corporate shares, does not preclude designation as a 'minority shareholder' within the meaning of the [New Jersey statute authorizing courts to take remedial action to protect minority shareholders]. . . . The statute aims to protect shareholders from the abusive exercise of power, and focuses on the relative power and ability of one side to oppress another, rather than on the percentage of stock ownership."); *Stringer v. Car Data Sys., Inc.*, 816 P.2d 677, 679

(Or. Ct. App. 1991) ("The question is whether a given shareholder or small number of shareholders has the requisite power to dictate or dominate corporate decisions . . . ."), *opinion modified on other grounds on reconsideration*, 821 P.2d 418, *aff'd*, 841 P.2d 1183 (Or. 1992).  The Court will therefore look to the degree of control or influence Exit SA had within JP Flexibles, considering the percent ownership and other indicia of control, to determine whether, based on the facts presented in the record, a reasonable jury could find that Exit SA's ownership of JP Flexibles was "significant" for the purposes of liability under the statute.

Before considering the degree of control, the Court must first address an initial dispute over what the relevant time period is for determining ownership.  The time period matters because in July 2006, after the last shipment of the WE24 hose from JP Flexibles to Graco but before Yanez's injury, Exit SA's ownership share of JP Flexibles increased from twenty percent to ninety percent when it acquired J.P. Fatzer's share from his estate. Yanez argues that the time of injury is the relevant period while JP Flexibles argues that the relevant period is limited to when JP Flexibles was actually distributing the hose in question, which ended with its last shipment to Graco in March 2006.  Given that under North Dakota strict products liability, a plaintiff must show that any defect "'existed when the product left the manufacturer,'" *Reiss v. Komatsu Am. Corp.*, 735 F. Supp. 2d 1125, 1136 (D.N.D. 2010) (quoting *Endresen v. Scheels Hardware & Sports Shop, Inc.*, 560 N.W.2d 225, 229 (N.D. 1997)), the Court concludes that the relevant period is that in which the hose in question could have been sold and delivered to Graco by JP Flexibles, which is through March 2006.

In March 2006, Exit SA officially owned twenty percent of the shares of JP Flexibles.  The Court need not conclude, though, whether a jury could find that this twenty percent ownership alone could amount to  "significant" ownership, because there are several other facts here that are relevant to this question.  First, in March 2006, Exit SA was one of three owners, the other two being the president of JP Flexibles, Medvecky, and J.P. Fatzer's estate.  A reasonable jury could conclude that, compared to these other two owners, Exit SA practically was in the best position to exert control over the company, especially given that the estate likely did not exert much substantive control.  Furthermore, as the Court concluded above, it was the manufacturer of the products that constituted the entirety of JP Flexibles' business and could ostensibly choose to end JP Flexibles' source of all of its business at any time.  *Cf. Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114 (Del. 1994) (observing that "a shareholder who owns less than 50% of a corporation's outstanding stocks" can be a "controlling shareholder" if it actually controls corporation conduct and holding that minority shareholder was a "controlling shareholder," despite owning less than fifty percent because it had enough power to overrule an action that others on the board seemingly favored simply by vetoing the action).  Second, the founder of JP Flexibles who had been a majority owner, J.P. Fatzer, had recently passed away.  A reasonable jury could conclude that this left a vacuum of control which Exit SA anticipated to fill.  Within several months of March 2006, in July 2006, Exit SA officially purchased J.P. Fatzer's seventy percent share of JP Flexibles.  (Medvecky Dep. 118:7-18.)

The record is somewhat sparse with regard to other possible indicia of control, such as evidence from board meetings or other correspondence indicating the extent to which Exit SA exerted control over JP Flexibles such that its ownership could be considered "significant" under the statute.  However, based on the facts present here – owning twenty percent of the shares with the only shareholder with a larger share being an estate, the anticipation of taking over the estates' shares and becoming a ninety percent owner, and the fact that the long-time president and majority shareholder had recently passed away, the Court concludes that on the record presented, a reasonable jury could conclude that Exit SA's ownership of JP Flexibles was significant such that JP Flexibles falls within the definition of manufacturer under the statute.  The Court will therefore deny JP Flexibles' motion for summary judgment.

## IV.   EXITFLEX USA'S MOTION FOR SUMMARY JUDGMENT

ExitFlex USA also moves for summary judgment, arguing that it cannot be held liable as a manufacturer or nonmanufacturing seller because it did not exist when Yanez's injury occurred and it cannot be held liable as a successor corporation to JP Flexibles.  The parties' dispute over ExitFlex USA's motion centers on whether ExitFlex USA can be held liable under a theory of corporate successor liability under North Dakota law.

### A.   Successor Liability Under North Dakota Law

The North Dakota Supreme Court has recognized that "[t]he long-established general rule is that a corporation which purchases the assets of another corporation does

not succeed to the liabilities of the selling corporation," unless one of the "four well-recognized exceptions to the general rule" applies. *Downtowner, Inc. v. Acrometal Prods., Inc.*, 347 N.W.2d 118, 121 (N.D. 1984). The exceptions include:

1. Where there is an express or implied agreement to assume the transferor's liabilities;

2. Where the transaction amounts to a consolidation or merger of the two corporations;

3. Where the transferee corporation is merely a continuation of the transferor corporation; []

4. [Where] [t]he transaction is an attempt to defraud the creditors of the corporation[,]

[or] . . . "where some of the elements of a purchaser in good faith are absent.

*Id.* (citing *Leannais v. Cincinnati, Inc.*, 565 F.2d 437 (7th Cir. 1977); *Cyr v. B. Offen & Co.*, 501 F.2d 1145 (1st Cir. 1974)).

In *Downtowner*, the North Dakota Supreme Court rejected the "product line" theory of liability and held that a successor corporation, Acrometal, could not be held strictly liable for damage to the plaintiffs' property which was allegedly caused by a product produced by Acrometal's predecessor corporation, Weather-Rite, which Acrometal had acquired after Weather-Rite suffered financial problems and went into receivership. *Id.* at 120, 123. The court observed that

Acrometal neither manufactured the allegedly defective product nor did it participate in any way in the chain of sale. Were we to impose liability on Acrometal in this circumstance it would be liability without duty; thereby removing strict liability from the realm of tort. This we refuse to do. If Acrometal is to be held liable, it must be because Weather-Rite's potential liabilities were assumed with the purchase of assets. Such a finding would require a significant change in corporate law. We would have to hold that the policies of strict liability justify a finding that, though a corporation has

> dissolved, potential liability should not dissolve with it and that a purchaser
> of the assets of the dissolved corporation should assume that liability.

*Id.* at 123.  The court thus rejected plaintiffs' arguments that failure to hold a successor corporation such as Acrometal liable was against public policy.  *Id.* at 123-25.

In another case, the North Dakota Supreme Court found that a successor corporation could not be held liable where "the clear language of the NSP–Rochester asset purchase agreement did not require Rochester to assume any debts, liabilities, or obligations relating to post-retirement health benefits of the telephone business's retirees, and the [plaintiffs] have not provided any evidence to raise a factual dispute that a separate contractual agreement exists between them and Minot Telephone, allegedly created the day they retired."  *Benson v. SRT Commc'ns, Inc.*, 813 N.W.2d 552, 561 (N.D. 2012).

### B.    ExitFlex USA

Applying these principles here, and predicting how the North Dakota Supreme Court would approach the facts of this case, the Court concludes that ExitFlex USA may be held liable as a successor corporation to JP Flexibles because a reasonable jury could conclude that it falls into the third exception – that ExitFlex USA is a "mere continuation" of JP Flexibles.  *Downtowner*, 347 N.W.2d at 121; *see also Axtmann v. Chillemi*, 740 N.W.2d 838, 855 (N.D. 2007) (Kapsner, J., concurring in part and dissenting in part) ("The successor corporation will be liable for the debts of the selling company when it is a mere continuation of the selling company.").  There are five factors to consider in determining whether an entity is a 'mere continuation':

(1) transfer of corporate assets (2) for less than adequate consideration (3) to another corporation which continued the business operation of the transferor (4) when both corporations had at least one common officer or director who was in fact instrumental in the transfer . . . and (5) the transfer rendered the transferor incapable of paying its creditors' claims because it was dissolved in either fact or law.

*Axtmann*, 740 N.W.2d at 855 (alteration in original).  A reasonable jury could conclude that at least four of the factors are present here.

With regard to the first and third factors, there was a transfer of corporate assets from JP Flexibles to ExitFlex USA, and upon the transfer ExitFlex USA continued the exact same business operation as JP Flexibles (and even provided the support for closing down JP Flexibles).  With regard to the fourth and fifth factors, both corporations had exactly the same shareholders and all employees transferred from JP Flexibles to ExitFlex USA, and, by design of the Asset Purchase Agreement, the transfer rendered JP Flexibles incapable of paying creditors – it sold all of its assets to ExitFlex USA but agreed to assume none of its liabilities.   Based on an analysis of these factors, a reasonable jury could conclude that ExitFlex USA was a "mere continuation" of JP Flexibles.  *Cf. McClellan v. Northridge Park Townhome Owners Ass'n, Inc.*, 107 Cal. Rptr. 2d 702, 706-07 (Ct. App. 2001) ("[I]f a corporation organizes another corporation with practically the same shareholders and directors, transfers all the assets but does not pay all the first corporation's debts, and continues to carry on the same business, the separate entities may be disregarded and the new corporation held liable for the obligations of the old." (internal quotations omitted)); *Hamaker v. Kenwel-Jackson Mach., Inc.*, 387 N.W.2d 515, 518 (S.D. 1986) ("[t]he key element of a 'continuation' is a

commonality of the officers, directors, and stockholders in the predecessor and successor

corporations." (citing *Leannais*, 565 F.2d at 439-40)).[7]

Although the North Dakota Supreme Court has little precedent beyond

*Downtowner* addressing successor liability, there are two important distinctions that

support the Court's conclusion that ExitFlex USA is a successor to JP Flexibles and liable

for its debts.  First, the predecessor corporation in *Downtowner* was in receivership, and

the court found it to be significant that "under the facts of this case, Acrometal was **not**

**responsible** for the destruction of the plaintiffs' remedy, where Weather-Rite had been

threatened with foreclosure and was in receivership."  *Downtowner*, 347 N.W.2d at 123

(emphasis added).  This suggests that the court would have found it to weigh in favor of

successor liability if the succeeding corporation held some responsibility for the

---

[7] The Eighth Circuit has also implied assumption of obligations into a successor relationship under North Dakota law under the second exception to the general rule of no successor liability – 'de facto merger' – which it held is present where:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.

> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

> (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

> (4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Keller v. Clark Equip. Co.*, 715 F.2d 1280, 1291 (8th Cir. 1983).  Under these factors, a reasonable jury could similarly conclude that JP Flexibles and ExitFlex USA have a successor relationship.

dissolution of the predecessor corporation (and therefore plaintiff's access to relief).  In

contrast, JP Flexibles did not dissolve because of financial problems, rather, Medvecky

stated that he and another employee decided to end JP Flexibles and start ExitFlex USA

as a "business decision."[8]   Second, *Downtowner* involved injury to property, not a

personal injury like Yanez's, and the court recognized that product line successor liability

is less warranted in the context of injury to property than in the context of bodily injury,

as with Yanez's alleged injury here:

> [c]losely related to this "justification" [for successor liability] is the concern
> expressed by many courts that a plaintiff is unable to protect himself from
> injury caused by defective products.  The vast majority of cases cited by the
> appellants [finding successor liability] involve bodily injury.  It has,
> however, been held that where the injury complained of is to property, the
> expansion of the "mere continuation" exception and the adoption of the
> "product line" exception is unwarranted.

*Id.* at 123 n.3 (citing *State ex rel. Donahue v. Perkins & Will Architects, Inc.*, 413 N.E.2d

29 (Ill. 1980); Fletcher Cyclopedia of the Law of Private Corporations § 7123 (Supp.)).

Thus, *Downtowner* does not require the Court to conclude that the 'mere continuation'

---

[8]   At oral argument, counsel for JP Flexibles and ExitFlex USA elaborated on this
testimony, stating that part of the reason for ending JP Flexibles and starting ExitFlex USA was
to protect J.P. Fatzer's estate from further liability.  This is precisely one of the reasons –
transferring assets to escape liability for debts – that have led courts to hold successor
corporations liable.  *See, e.g.*, *Downtowner*, 347 N.W.2d at 121 (listing an exception for no
successor liability as when "[t]he transaction is an attempt to defraud the creditors of the
corporation").  Although not in the record, the Court concludes that it is fair to consider this
piece of information at this stage, both because, based on counsel's representation, it seems
likely that something to that extent could be presented at trial, and because, where the record
otherwise includes no explanation for the change, a reasonable jury could fairly reach the
conclusion that the change was motivated by a desire to avoid liabilities.

exception to successor liability does not apply to ExitFlex USA given the circumstances here.

The arrangement here includes one fact that ExitFlex USA argues weighs against successor liability, even more strongly than in *Downtowner* – the express disclaimer in the Asset Purchase Agreement that ExitFlex USA did not assume JP Flexibles' liabilities. The successor in *Downtowner* had not expressly declined to assume all liabilities as the Asset Purchase Agreement states here.   But the Asset Purchase Agreement does not preclude the conclusion that ExitFlex USA was a mere continuation of JP Flexibles such that it could assume JP Flexibles' liabilities.   As the Court in *Downtowner* observed, "[t]he traditional rule of corporate nonliability was developed in response to the need to protect a bona fide purchaser from the unassumed debt liability of its predecessor." *Downtowner*, 347 N.W.2d at 121.   A reasonable jury could conclude that ExitFlex USA was not a bona fide purchaser here in need of protection – beyond the identical owners, employees, and business operations, Medvecky was the person who signed the Asset Purchase Agreement for **both** ExitFlex USA and JP Flexibles.   Given that the record contains no explanation for the transition from JP Flexibles to ExitFlex USA, a reasonable jury could further conclude that the exculpatory liability clauses in the Asset Purchase Agreement were actually aimed at avoiding any further liabilities for JP Flexibles.   Under such circumstances, a conclusion that ExitFlex USA was a mere continuation of JP Flexibles could reasonably outweigh any explicit agreement disclaiming liabilities, where such agreement could be found to be part of a scheme to avoid liability.

Thus, given that the 'mere continuation' factors support successor liability here and in light of these suggestions from the North Dakota Supreme, the Court concludes that successor liability for ExitFlex USA is not barred as a matter of North Dakota law. Rather, viewing the facts in a light most favorable to Yanez, the Court concludes that a reasonable jury could find that ExitFlex USA was a mere continuation of JP Flexibles and therefore liable as a successor corporation. *Cf. Turner v. Bituminous Cas. Co.*, 244 N.W.2d 873, 884 (Mich. 1976) (reversing grant of summary judgment where facts viewed in a light most favorable to nonmoving party made out prima facie case of successor liability).

## V.      GRACO AND MIDWAY'S MOTION FOR SUMMARY JUDGMENT

Graco and Midway also jointly move for summary judgment, arguing that they are not manufacturers under the statute.  Yanez makes several arguments in support of Graco's and Midway's liability. First, he argues that Graco and Midway cannot be dismissed as nonmanufacturing sellers under the statute because they did not meet the requirements Yanez believes the statute imposes upon nonmanufacturing sellers.  Second, Yanez argues Graco is a manufacturer because Graco sought to have ExitFlex SA add the ID ring to the hose.  Third, Yanez argues that Graco manufactured the entire paint system and chose to include the hose in that paint system and that the paint system caused Yanez's injuries.  The Court concludes that there are no genuine issues of material fact such that a reasonable jury could conclude that Graco or Midway are liable for Yanez's

injuries on account of their involvement in the distribution of the hose, its accompanying

ID ring, and the paint system.

### A.    Dismissal as a Nonmanufacturing Seller

Yanez argues Graco and Midway cannot be dismissed as nonmanufacturing sellers

under the statute because they did not submit an affidavit certifying the identity of the

manufacturer and because the manufacturer has not been added to the complaint.   The

statute provides that in an action against a nonmanufacturing seller, "the seller shall upon

answering or otherwise pleading file an affidavit certifying the correct identity of the

manufacturer of the product allegedly causing the [injury]."   N.D. Cent. Code § 28-01.3-

04, subd. 1.   The next subdivision provides that "[a]fter the plaintiff has filed a complaint

against the manufacturer and the manufacturer has or is required to have answered or

otherwise pleaded, the court shall order the dismissal of the claim against the certifying

seller . . . .".   *Id.*, subd. 2.   Subdivision 3 lists several exceptions to dismissal under which

a plaintiff may vacate a dismissal under subdivision 2.   *Id.*, subd. 3.   Yanez argues, in

essence, that the statute makes an affidavit certifying the manufacturer's identity and the

inclusion of the manufacturer as a defendant in the case prerequisites to a court's

determination that a seller cannot be held liable.

There are several difficulties in applying this statute in these circumstances.   First,

the defendants do not appear to have complied with subdivision 1, which requires them to

submit an affidavit certifying the identity of the manufacturer.   Second, Yanez has not

filed a complaint against ExitFlex SA, the apparent manufacturer, such that the statute

would even appear to require the Court to dismiss Graco and Midway.  Finally, assuming that dismissal would be proper, Yanez does not appear to fit into any of the exceptions to dismissal.  The parties point to further problems with applying the statute in this situation: it does not provide a deadline for the affidavit identifying the manufacturer and does not account for a plaintiff's delay in joining a manufacturer that has been identified.  Defendants argue that this leaves open the possibility that a plaintiff could intentionally delay joining the true manufacturer in order to prevent dismissal of a seller, even though the seller has done everything that is required of it under the statute.  *See* N.D. Cent. Code § 28-01.3-04, subd. 3 (permitting plaintiff to move to reinstate a seller if plaintiff can show "[t]hat the applicable statute of limitation bars a product liability action against the manufacturer").  Here, it was Yanez's choice to not file a complaint against ExitFlex SA because it did not anticipate the Court having personal jurisdiction over the entity, even though it discovered the identity of ExitFlex SA as the manufacturer within the statute of limitations.  (Lillehaug Aff. ¶ 2.)

Given these difficulties, the Court declines to dismiss Graco and Midway on the basis of the statute.  Based on the plain text of the statute, it appears that the Court is not required to "order the dismissal of the claim against the certifying seller" because Yanez has not yet "filed a complaint against the manufacturer."  N.D. Cent. Code § 28-01.3-04, subd. 2.  However, to rely on that plain text implicates the concerns raised by Graco and Midway of holding nonmanufacturing sellers captive to the filing proclivities of a feet-dragging plaintiff.  On the other hand, the statute provides no mechanism for a plaintiff to avoid dismissal of a nonmanufacturing seller if filing a complaint against the

manufacturer would be futile because of jurisdictional issues.  Given the lack of clarity or explanation in the statute and decisions interpreting it, the Court will leave these issues to the legislature and courts of North Dakota.  Because, as explained below, the Court concludes that Graco and Midway are entitled to summary judgment on the merits of Yanez's claims, the Court finds no unfairness in not relying on this statute as a basis for dismissing the claims against them.[9]

### B.      Liability for Graco as a Manufacturer

Yanez argues that Graco may be held liable under the statute because of its involvement in placing the ID ring on the hose and because it designed the entire paint system.   Yanez points to the portion of the definition of manufacturer stating a manufacturer means an entity who "designs, . . . produces, . . . or otherwise prepares a product or a component part of a product," N.D. Cent. Code § 28-01.3-01, subd. 1, to argue that Graco may be held liable under the statute.  The Court concludes that the evidence in the record would not permit a reasonable jury to find that Graco's

---

[9] With regard to the affidavit certifying who the manufacturer is, Graco's counsel represented at oral argument that it did not file such an affidavit immediately because the manufacturer could not be determined until after destructive testing because the hose was covered with paint.  (*See* Stipulation Regarding Mot. for Order Permitting Destructive Testing, Dec. 9, 2011, Docket No. 60 (giving the parties until February 15, 2012 to discover who manufactured the hose).)  Yanez agreed to a process for discovering the true manufacturer and discovered who the manufacturer was within the statute of limitations.  (*See id.*; Lillehaug Aff. ¶ 2.)  However, it is not clear whether the certifying affidavit is a prerequisite to dismissal under the statute.  Because the Court declines to rest its ruling on Graco and Midway's summary judgment motion on the statute, the Court need not address the significance of the circumstances surrounding the identification of the manufacturer to Yanez.

involvement with the ID ring on the hose or design of the paint system renders it liable under this definition.[10]

### 1.    ID Ring

Yanez argues that Graco's ID ring played a role in contributing to the failure which caused Yanez's injury.  He points to the affidavit of his expert, Lester Engel, in which Engel states that "[t]he incident hose has failed in an area adjacent to the end of the hose fitting on the gun end.  This end also has an identification band 1.3 inches from the end of the fitting."  (Aff. of Lester B. Engel, Ex. A. ("Engel Report") at 4, Feb. 13, 2014, Docket No. 171.)  Engel also stated that

> an inadequate wire braid design . . . is combined with the use of identification marking tags which are crimped tightly onto the hose close to the end of the fitting. . . . The application of a tight fitting identification band a short distance from the end of the fitting on the hose further compromises the structural integrity of the wire braiding.  The tight identification band restricts the distribution of the strain in the hose during bending.  When bending occurs at the fitting end of the hose with the identification band in place, all of the bending occurs in the 1.3-inch length of hose between the end of the fitting and the identification band.  With the present wire braid design, this bending results in the observed bulging of the wire braid at the end of the fitting.  With the bulging, structural integrity of the hose is compromised and a premature leak develops.

(Engel Report at 5.)  These statements provide a sufficient basis upon which a reasonable jury could conclude that the ID ring caused Yanez's injury, but they do not offer an

---

[10] To the extent that Yanez also argues that Graco falls within one of the exceptions to nonliability for nonmanufacturing sellers, such as when the nonmanufacturing seller "exercised some significant control over the design or manufacture of the product," or "created the defect in the product which caused the personal injury," N.D. Cent. Code § 28-01.3-04, subd. 2(a), (c), the Court concludes, for the reasons explained in this section, that none of these exceptions apply.

opinion as to **Graco's involvement** in the design, manufacture, or addition of the ID ring so as to bring it within the scope of potentially liable defendants under the statute. Evidence of Graco's involvement indicates that Graco requested that certain pieces of information be printed on the metal ferrule at the end of the hose, but that ExitFlex SA found that to be too difficult, and instead ExitFlex SA proposed to print the information on a metal ring that would encircle the hose.  Medvecky proposed this to Graco in a letter, and Graco agreed to the arrangement.  (*See* Rusert Aff., Ex. D (letter from Medvecky to Graco stating that a sample of the ID ring "that we are proposing to supply on the WE24 hose" was enclosed and that the ID ring "is our alternative to printing the information on the ferrule itself").)  Thus, Graco's involvement was limited to approving an alternate proposal submitted by the manufacturer in light of practical limitations and capabilities as identified by the manufacturer.

This is distinct from circumstances in which the North Dakota Supreme Court has recognized that an intermediary seller may be liable for injury caused by a product; in those cases the intermediary seller has **actually made** the alteration or modification, rather than simply requesting a slight addition and relying upon the manufacturer's proposal for how to incorporate that into the original design.  *See Oanes v. Westgo, Inc.*, 476 N.W.2d 248, 251 (N.D. 1991); *Witthauer v. Burkhart Roentgen, Inc.*, 467 N.W.2d 439, 440-41 (N.D. 1991).  Thus, because Graco did not manufacture the ID ring or build it into the hose, it cannot be said that Graco "design[ed]," "produce[d]," or "prepare[d]" the product.  *See* N.D. Cent. Code §§ 28-01.3-01, subd. 1.  Graco was neither responsible for the design of the ID ring nor for gauging its effect on the structural integrity of the

hose – Graco did not instruct ExitFlex SA to use an ID ring as a method of including the additional information Graco sought to add to the hose. The Court thus concludes that, based on plain reading of the statute, a reasonable jury could not find that this involvement amounts to "design[ing]," "produc[ing]," or "prepar[ing]" the hose. *See id.*

### 2.   Paint System and Testing

Yanez also argues that Graco can be held liable under the statute for preparing and designing the paint system and for the decision to include this hose in the paint system after conducting extensive testing. Graco objects that Yanez failed to allege any defect in the paint system in his complaint and that any claim based on the paint system should be dismissed. The Court finds that the complaint adequately incorporates the paint system into its allegations of the defects causing Yanez's injuries. (*See, e.g.*, Am. Compl. ¶¶ 8, 11, 16-18, 25, 30, 33-34.) But although Yanez incorporated some allegations about the paint system into his complaint, he has failed to present any evidence that the paint system, rather the hose, was defective or caused his injuries. When asked at oral argument what evidence supports his claim based on the paint system, he pointed to no evidence but instead explained that this theory of liability is based on Graco's **decision to use** the WE24 hose in its paint system. But Yanez has not presented any evidence that the choice to use that model of hose – with its pressure rating, length, and materials – was a defective design choice that caused his injury. Rather, his expert opines that the hose itself was defective and caused his injury. There is no evidence in the record that it was the hose's placement in the paint system that gave rise to the injury.

Relatedly, Yanez argues that the fact that Graco performed tests on the hose renders it liable as a manufacturer under the statute.  Yanez refers to Redlund-Spieker's testimony in support of this argument, but she testified that in determining whether the hose would be a good fit in one of its paint systems, her staff reviewed the testing that had been done by the manufacturer.  (Redlund-Spieker Dep. at 34:40-35:13; 35:19-36:3; 44:1-16.)  Graco did one product qualification test on its own to see if the hose could handle the pressure that the paint system would require.  (*Id.* at 38:6-39:13).  This kind of testing – for whether a given product would work for a specific function – does not open Graco up to liability under the statute for a defect in the hose itself.  No reasonable jury could conclude that Graco designed, produced, or prepared the hose or any defect in it by reviewing testing that had been done by ExitFlex SA or by observing whether the hose would fit within the paint system.

The Court therefore concludes that no reasonable jury could conclude that Graco's involvement with the ID ring or selecting the hose to be part of a paint system rendered it a manufacturer.  The Court thus concludes that Graco and Midway's motion for summary judgment must be granted.  No reasonable jury could find that Graco was a manufacturer of the hose.

This case will be placed on the Court's next available trial calendar.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      ExitFlex USA, Inc.'s motion for summary judgment [Docket No. 148]  is

**DENIED**.

2.      J.P. Flexibles, Inc.'s motion for summary judgment [Docket No. 153] is

**DENIED**.

3.      Graco, Inc.'s and Midway Industrial Supply Co. Inc.'s motion for summary

judgment [Docket No. 157] is **GRANTED**.


DATED:   September 8, 2014                     s/ John R. Tunheim
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                 United States District Judge